Filed 1/27/16  P. v. Bolden CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAVIER BOLDEN,<br><br>    Defendant and Appellant. | B260188<br><br>(Los Angeles County<br>Super. Ct. No. BA397880) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge. Affirmed.

Joshua L. Siegel for Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and Steven E. Mercer, Deputy Attorney General for Respondent.

# INTRODUCTION

Defendant and appellant Javier Bolden confessed twice to the double murder and robbery of two University of Southern California (USC) graduate students. He also confessed to an unrelated earlier attempted murder of a male outside a nightclub near USC. We conclude that under the totality of the circumstances, the defendant's recorded confessions were not motivated by express or implied promises of leniency, threats, or other coercive police activity, and these confessions are voluntary. We find the omission of instruction on second degree murder and involuntary manslaughter is harmless, and the trial court did not abuse its discretion in denying defendant's mistrial motion.

The jury convicted defendant of the murders of Ying Wu (Wu) and Ming Qu (Qu) in counts 1 & 2 (Pen. Code,[1] § 187, subd. (a)); the attempted murder of Deionce Davance (§§ 664/187, subd. (a); count 4),[2] and assault on Zanae Flowers with a semi-automatic firearm (§ 245, subd. (b); count 5). The jury found true two special circumstances—multiple-murder and robbery-murder—as to the murder counts. (§ 190.2, subds. (a)(3) & (a)(17).) The jury also found true the following allegations: that a principal was armed with a handgun in all counts (§ 12022, subd. (a)(1)); that defendant personally and intentionally used and discharged a handgun that caused great bodily injury in count 4 (§ 12022.53, subds. (b)-(d)); that defendant personally used and discharged a semi-automatic firearm in count 4 (§ 12022.5); and that defendant personally inflicted great bodily injury in count 5 (§ 12022.7, subd. (a)).[3]

---

[1] All further statutory references are to the Penal Code, unless otherwise specified.

[2] Count 3 originally charged defendant with a separate attempted murder but was deleted in the final amended information.

[3] Bryan Barnes was appellant's accomplice in the murders. He was originally charged jointly with appellant, but later plead guilty to two counts of murder. He was sentenced to consecutive terms of life without parole.

The trial court sentenced defendant for the murders on counts 1 and 2, to two consecutive terms of life without parole, plus one additional year on each count for the principal-armed allegations. For the attempted murder conviction on count 4 defendant was sentenced to life, plus 25 years to life for the firearm enhancement. For the assault with a deadly weapon conviction on count 5, defendant was sentenced to 22 years, consisting of the upper term of 9 years, plus 13 years, consisting of 10 years for the firearm use enhancement, and 3 years for the great bodily injury enhancement.[4]

Defendant raises six issues in his appeal from judgment. First, he argues his confession to the police was involuntary. Second, he contends his jail cell confession to a confidential informant, posing as a fellow gang member was the tainted product of the earlier involuntary confession. Third, he argues the booking exemption does not apply to the Detective's pre-*Miranda* question illiciting his phone number. Fourth, he argues he was entitled to a lesser included jury instruction on second degree murder and involuntary manslaughter. Fifth, he contends the trial court's erroneous ruling on the intent-to-kill requirement, which was corrected in the jury instructions required a mistrial, and sixth, the errors were cumulatively prejudicial.

We find no reversible error and affirm the judgment.

---

[4] The trial court struck the principal-armed allegation in count 5, in accordance with its previous ruling granting the People's motion to dismiss that allegation.

## BACKGROUND

**1.** *The February 12, 2012 shootings of Deionce Devance and Zanae Flowers*

On the evening of February 12, 2012, a party was held at the Garr Banquet Hall, near Western and 51st Street, south of the USC campus. At least 100 people were inside. Devance attended the party with Tamara McKeever, his sister, Charles Darden, and Zanae Flowers. Sometime before midnight, the lights came on, and the music was turned down.

As Devance and McKeever headed toward the exit, Bolden entered with a large group of other African-American males and females. Bolden was "loud and irate and he was gang banging." Making hand gestures, he announced loudly "8 Tray Gangsters" and also said "8 Tre Gangsters movin." Flowers characterized Bolden as "riled up" and "coming to start trouble." Darden considered Bolden and his friends as being "ready to start problems." After Devance told Bolden he almost hit McKeever, Bolden punched him, and the two fought. At least twenty others joined in the fight. A security guard ejected Devance and Darden, who then stood on the sidewalk. Outside, McKeever and Flowers began to fight a group of females.

On the sidewalk Bolden approached Devance and asked "Who are you?"; and then shot him. Grabbing his stomach, Devance said "I got hit" and fell. Devance had been shot twice. One bullet went through the back of his head and exited his left eye. The second entered his left abdomen and existed his back. He sustained permanent, debilitating brain injuries resulting in paralysis, inability to speak, and the need for round-the-clock nursing care.

Upon hearing the gunshots, McKeever and Flowers began running south. Flowers was shot in the leg and fell, screaming.

McKeever and Darden were each "a hundred percent" that Bolden was the shooter.

## 2. *The April 12, 2012 Murder of Qu and Wu*

On April 12, 2012, about 1:00 a.m., Jovanny Ordonez was at home on Raymond Avenue near USC when he heard what sounded like a loud firecracker and glass breaking. Looking out the window, he saw a BMW with its hazard lights blinking parked across the street. Qu exited the car; crawled to the porch of a house, and knocked on the door, breaking the glass. When Ordonez approached Qu, the latter was on his back and choking on blood. Ordonez called 911 and returned to Qu who indicated someone else was in the car. At the BMW, Ordonez noted Wu, Qu's girlfriend, slumped forward in the front passenger seat. She was not responsive.

While at home, Eury Maldonado, a neighbor, heard two rapid gunshots and the sound of glass breaking. From his second floor balcony, Maldonado observed two African-American males, one on each side of Qu's BMW. They argued loudly and then ran off together southbound. Maldonado could not see their faces, because they wore head coverings, i.e., "hoodies." When the bleeding Qu exited the car, Maldonado called police.

Wu had been shot twice and died from gunshot wounds to her chest. Qu died from blood loss due to a single gunshot wound behind his left ear.

## 3. *The Police Investigation*
### a. *Scene Investigation*

At the Devance and Flowers shooting scene, the police found an expended 9-mm casing on the sidewalk in front of the nightclub and another about eight feet from where Devance was lying. A live 9-mm round was retrieved on the ground about 30 feet away.

At the Wu and Qu shooting scene, the police observed a hole in the BMW driver's side window, which had been broken partially inward. No third party fingerprint or DNA evidence was found. A 9-mm bullet was on the front passenger seat, and a second bullet was between that seat and the right front door jamb. Two expended 9-mm casings were

5

in the street not far from the car. This firearm evidence and examination of the BMW itself indicated someone had fired into the car through the driver's window. All the 9-mm casings found at both shooting scenes were fired from the same semiautomatic 9-mm handgun. Qu's and Wu's cell phones had been stolen.

### b. *Cell Phone Investigation*

With respect to the February 12, 2012 shootings, Bolden's cell phone was used in the vicinity of the banquet hall at 11:23 p.m. and at 12:06 a.m.

As to the April 12, 2012 shootings, Bolden's and Barnes' cell phones were used in the shooting vicinity at 12:14 a.m. and 1:02 a.m. At 12:55 a.m., a call was made from Bolden's phone to Barnes' phone that lasted six and a half minutes. At 1:09 a.m., shortly after Wu was shot, her cell phone received an incoming call in the area of Barnes' house that was not answered. Between 1:32 and 2:07 a.m., Barnes' phone was used in the vicinity of his house. At 1:36 a.m., Bolden's phone was used not far from Barnes' home. Between 6:00 a.m. and 11:00 a.m., Wu's phone was used in the vicinity of Barnes' house.

### c. *Wiretap Phone Conversations and Arrests of Barnes and Bolden*

Pursuant to a wiretap warrant, the police recorded two phone conversations, one between Bolden and Barnes and the other between Bolden and an unknown female. The recorded conversations were played for the jury. In the first conversation recorded on May 17, 2012, Bolden and Barnes discussed their robbery of the "little Asia people"; the shooting through the window; and "snatch[ing]" of cell phones. In a phone conversation later the same day, Bolden told an unidentified woman he no longer partied on Western. When asked why, Bolden responded, "Last time I partied on Western, I had to kill somebody."

6

Barnes was arrested just after he left a cell phone store in Compton where police recovered an iPhone stolen during the Qu and Wu shooting incident.

On May 18, 2012, at 6:03 p.m., the police arrested Bolden and seized his cell phone.

### d. *Bolden's Statements During Police Interview*

At the police station following his arrest, Detectives Carreon and Hansen conducted a videotaped interview of Bolden, which was played for the jury. Prior to his *Miranda* advisement, Carreon asked Bolden for his name, date of birth, address, and telephone number. Bolden responded his name was Javier Bolden; his date of birth was "8/29/92"; he lived on Atmore Street in Palmdale; and his phone number was "323 599-3681." Bolden was then advised of his Miranda rights, which he understood and waived.

During the interview, Bolden admitted he and Barnes were involved in the shooting of Qu and Wu and identified "Tyrell," Bolden's cousin, as their driver. Bolden indicated their plan was to rob Qu and Wu. Barnes shot both of them and snatched their phones. Bolden stated because Barnes was his "boy," "I just go with it." Bolden denied involvement in the 2012 February shooting of Devance and Flowers.

### e. *Bolden's Statements to Confidential Informant*

After the interview, Bolden was placed in a jail cell with a confidential informant posing as a fellow Blood gang member. The recording of their conversion was played for the jury. During this conversation, Bolden discussed both shooting incidents. Bolden explained he "popped" Devance during a gang confrontation and gave this description of the shooting: "Boom, [I] popped him. Hit him . . . he tried to run . . . Then he tried to walk away."

Bolden characterized the shooting of Qu and Wu as the product of an unsuccessful carjacking near USC while "we was out there robbin' people." He explained the people

7

would not "get out of the car; so my brother bust through the window Boom Boom." He described the driver as being hit in the head and the passenger as "just slumped" and identified the car as a BMW. Bolden admitted he also fired a shot but added the bullet did not break the passenger's window. He explained although they planned to steal the car, they only "snatched the phones" because they "heard people come out [of] the house." "I got out of there and the two people in the car died." He stated they later sold the guns and complained "[w]e got caught because of the fucking phones."

### 4. *Defense*

Bolden relied on a mistaken identification defense and on the theory the prosecution failed to prove he had any involvement in the shootings.

## DISCUSSION

### *Bolden's Police Interview Statements Were Voluntary*

Bolden contends the trial court erred in refusing to suppress his incriminating statements made during the police interview because his confession had been coerced through threats, promises of leniency, and other unlawful police tactics. Admission of Bolden's statements was not error. The totality of the circumstances establishes his statements during the recorded interview were voluntary.

### *Circumstances Regarding Bolden's Police Interview*

On May 18, 2012, Bolden's police interview began at 9:00 p.m., and lasted two hours and thirty-seven minutes, including a five-minute break. Less than three minutes before any substantive questioning, Bolden was advised of and waived his *Miranda* rights. About halfway into the interview, Bolden made statements incriminating himself as an aider and abettor to the Qu and Wu murders. He denied any involvement in the February 12, 2012 shooting incident.

8

During the initial hour, and prior to the incriminating statements, the detectives exhorted Bolden to provide information about the shootings, tell the truth, and not lie. ["You wouldn't lie to me about that, would you?"], ["You need to – you need to come clean with us. Okay?"], ["[W]e want to talk to you about it. And we want you to be very honest."], ["It's . . . very important to you that you start telling the truth and start thinking about yourself."], ["I want you to be truthful to me. And I want you to tell me about the shooting that you were involved in."], ["I'm letting you know it's over with now. Okay. You need to be honest with me. You better start saving your ownself [sic]."], ["If you want to go to jail for the rest of your life, if not until something else happens to you, you know what, you better start talking."], ["And some of the things that [Barnes] is saying don't really add up to me. But, I'm trying to get the truth out of you. All right?"], ["The decision to not tell the truth will affect you for the rest of your life."], ["The truth is the only thing that's gonna help you right now. And, let me tell you, you're in a world of hurt right now. And the only one that's gonna . . . get you out of it, is you."], ["[Y]ou have an opportunity, right now, to tell the truth, to make sure that, hey, the truth came out, at least."]

The detectives also exaggerated the state of the evidence connecting Bolden to the shootings and accused him of lying when he denied any involvement, adding "we have physical evidence to prove that." They told Bolden he was implicated in the shootings through the evidence they possessed, including DNA evidence, witness identification, camera footage, Barnes' statements,[5] and one of the stolen phones. ["We have a lot of data on you"], ["you guys were identified"], [physical evidence], ["[Y]our buddy [Barnes], your partner in crime there . . . he gave us his side of what happened"], ["We – got everything. We have the phone. You know, we have people identifying you guys. I mean . . . it couldn't be a better case"], ["They got a lot of cameras [around USC]"],

---

**5**     Detective Hansen told Bolden that Barnes said Bolden pulled the trigger. Detective Carreon admitted attributing statements to Barnes was a ruse.

["We have overwhelming evidence that shows that you were there," including video], ["This DNA stuff, incredible. Incredible stuff"].)

Additionally, the detectives told Bolden about the serious consequences of the murders. Detective Hansen stated, "I guarantee you, you're not getting out." Detective Carreon advised,"[Y]ou're really making a huge mistake covering up for something . . . that's gonna affect you the rest of your life." ["Some bad decisions can really affect your life forever"].) Hansen asked Bolden if he was prepared to be in prison "for 25, 30 years plus, at a minimum[.]" He clarified, "I'm not threatening you, in any way. I'm just saying you just don't seem to be grasping how serious the situation is." He added, "You're gonna be within four walls for a very, very long time."

At 55 minutes into the interview, Carreon advised Bolden he might be eligible for life in prison or the death penalty: "And you're gonna do the rest of your life in prison, if not, the death penalty. It is – I mean, a death penalty eligible case. Okay. I'm not saying that you're gonna get the death penalty. But, this is something that's possible. Okay. Uhm, we don't want to play games with you. We wanted to give you the opportunity to . . . tell us what happened out there." He then urged Bolden again to tell the truth. He advised: "The only thing that's gonna save you, right now, is if you tell the truth. Besides that, you don't have hope. There is no hope for you at all." He denied "trying to bullshit" Bolden or "trying to make [him] say something that isn't true or anything like that." He added, "I wanted you to tell us the truth. And we gave you the opportunity. And we – we went around with you for a little bit. We're not gonna do that anymore. Either you're gonna tell us or you're not."

Bolden asked if he could "step out of here." Carreon responded no and admonished "you don't have control here" and "the only thing you're in control of is your own destiny – what's gonna happen to you for the rest of your life." He cautioned, a jury would consider his failure to discuss truthfully what happened as proof he "don't even care" and it "wasn't no big deal to you." Through this portion of the interview, Bolden had laughed and smiled repeatedly. Carreon advised him to "show some

10

remorse" and asked if he wanted the jury to see him "laughing about it, chuckling it up" as if "[y]eah, it's- it's funny."

Bolden asked "[W]hat is the truth gonna do for me?" Carreon responded the truth would "show a jury that, hey, he shows a little bit of remorse. Right now, you're a cold-blooded killer to the jury." Momentarily, Bolden stated "I didn't have no gun." Several minutes later, he made additional incriminating statements regarding the Qu and Wu murders, including the claims that it was his cousin's idea to go out robbing people; Barnes was the shooter; Bolden told him to get "whatever you can get"; and Barnes snatched the victims' phones.

### *Admission of Bolden's Police Interview Statements*

Prior to trial, the prosecution filed a motion for admission of Bolden's statements to the police. In opposition, the defense argued the statements should be suppressed as involuntary, because the detectives used coercive tactics, namely, implying Bolden would be better off if he told what happened and threatening him with the death penalty for the murders.

Following a hearing, the trial court, which had viewed the police interview video, granted the motion, because the statements were voluntary under the totality of the circumstances. The court found the brief reference to the death penalty was inconsequential, explaining although "[t]hey do mention the death penalty, . . . in the overall context of this fairly long interview, it's mentioned a single time. And in my view, it's not either used as a threat or an inducement for some kind of leniency. And it's basically a truthful statement of what the law is and what the situation is." The court noted that for the most part, the detectives "emphasize[d] the prison aspect, not the death penalty aspect" of the potential consequences of the murders. The court "found no indication . . . that it's some kind of trade-off, that [the detectives are] going to do something about the death penalty, [that] they are going to help [Bolden] in some way regarding the death penalty in exchange for his testimony." The court also pointed out

11

Bolden did not break down immediately in the face of the death penalty comment and his incriminating statements "come many minutes later."

The court also found no "psychological coercion" was employed and there was "[s]imply no indication" that Bolden's "will was overborne or that he was psychologically coerced." The court characterized the interview as "a conversation between [Bolden] and the [detectives]" and noted although Bolden "is soft spoken[, he] is certainly dealing with the [detectives] in a conversational manner." The court considered Bolden as "almost interviewing" the detectives, because he "plays like a cat-and-mouse game" and continually asked questions like "What do you guys know"; "What have you got"; and "[S]how me what you got."

The trial court "couldn't find any implied promise of leniency" or that the detectives had "misexplain[ed] something in such a way that [Bolden] thought that he would be dramatically helped by telling them" what happened. The court did find Bolden was both familiar with the criminal justice system and "knows his way around this kind of situation" and that in the interview, "he is holding his own."

In addition to the above reasons, the trial court's finding of "no evidence of coercion" also was based on these factual findings: The fact Bolden was smiling demonstrated he was not overwhelmed by the death penalty; the detectives were "not overly aggressive or overbearing"; rather, they were "[v]ery conversational, soft spoken"; Bolden was "bantering with the police"; and their conversation had a "free-flowing style[.]"

### *Standard of Review*

"An involuntary confession may not be introduced into evidence at trial. [Citation.] The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, '"[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne."' [Citation.]

12

Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] '"On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review."' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.

"'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked. [Citation.]' [Citation.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.)

"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.] The distinction that is to be drawn between permissible police conduct on the one hand and conduct deemed to have induced an involuntary statement on the other 'does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth as represented by the police.' [Citation.] Thus, '[when] the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement

13

involuntary and inadmissible. . . .' [Citations.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 611-612, superseded in part by constitutional amendment as stated in *People v. Markham* (1989) 49 Cal.3d 63, 65 and overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17.)

"[C]ourts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion, [Citation]; the length of the interrogation, [Citation]; its location, [Citation]; its continuity, [Citation]; the defendant's maturity, [Citation]; education, [Citation]; physical condition, [Citation]; and mental health, [Citation.]" (*Withrow v. Williams* (1993) 507 U.S. 680, 693 (*Withrow*).)

### No Indicia of Involuntariness Infected Bolden's Statements

We have listened to and watched defendant's videotaped police interrogation in fulfilling our obligation to make an independent determination of the voluntariness of defendant's confession. We find no indicia of involuntariness infected Bolden's statements during the police interview. Bolden claims his statements were involuntary in part due to coercive police tactics. He points out the police were in force when they arrested him and that they transported him by helicopter from his home in Victorville to the Los Angele police station, which he contends "only served to scare [him] by showing him the amount of police resources that were being devoted to him." He faults the police for not waiting until the next morning to interview him "so that [he] would be rested for the questioning." Further, although he complained of being cold during the interview, the detectives "never gave him a blanket or jacket."

We are not persuaded these matters amount to coercive police tactics which would render his statements involuntary. First, Bolden does not assert or demonstrate that the show of force during his arrest and/or the helicopter ride to the police station so intimidated and frightened him that his free will was impaired. Granted, deprivation of sleep might affect the voluntariness of a suspect's statement. (*Withrow, supra,* 507 U.S.

14

at p. 693.) However, he cites no authority for his novel proposition that the police must wait until morning to interview a criminal suspect, because the suspect is entitled to a night of rest before questioning. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 643 ["A legal proposition asserted without apposite authority necessarily fails"].) Further, Bolden points to no evidence that during the interview, which took place at 9:00 p.m., not the middle of the night, and ended at 11:00 p.m., he was so sleep-deprived that his will was overborne. That the two shooting incidents occurred about midnight and 1:00 a.m., respectively, leads to a contrary inference. His contention is further belied by the fact he was sufficiently rested to engage in a lengthy conversation with the confidential informant shortly after his police interview. Bolden's several complaints of being cold during the interview also lack significance. In response to his first complaint, Carreon observed "it's kind of warm in here" and appeared surprised Bolden felt cold despite his pajamas. Bolden himself later acknowledged "I'm always cold." In any event, his smiling, laughing, and banter with the detectives reveal his state of being cold was not so severe as to overcome his free will. Rather, as reflected in the video and as the trial court observed, Bolden was "holding his own" and playing "cat-and-mouse" with the detectives. Also, Bolden told the detectives it was "[n]ice talking to you."

Bolden contends his age and only "minor criminal record" also allowed his will to be overborne. The record refutes this contention. At the time of the interview, Bolden was almost 20 years old. He did not display any indicia of vulnerability or susceptibility to coercion. During the interview, he was composed and unfazed by the situation, nor was he intimidated by the detectives with whom he smiled, laughed, and bantered. Throughout the interview, Bolden is calm, relaxed, and soft spoken. He demonstrates he is not easily intimidated, and is able to spar evenly with his questioners, attempting to turn the tables on them by repeatedly asking "what have you got," "what do you guys know." Although he confessed to the murders of Qu and Wu, he steadfastly denied any involvement in the February 12, 2012 shooting. This is a significant compelling fact demonstrating his will was not overborne by the police.

15

Additionally, his criminal record was not trivial.  At the time of his arrest in this matter, Bolden was on formal felony probation for making a criminal threat against a school officer and a prior arrest and conviction for animal cruelty.

Bolden further contends his incriminating statements were induced through improper promises of leniency and threats of increased punishment.  No such promises or threats were made.  The detectives made no express or implied promises of leniency to induce Bolden to incriminate himself.  Rather, they merely exhorted him to tell the truth, be honest, and show remorse.  Such exhortations unaccompanied by promises of leniency are permissible.  (*People v. Williams* (2010) 49 Cal.4th 405, 444 (*Williams*); *People v. Holloway* (2004) 33 Cal.4th. 96, 115 (*Holloway*).)  Similarly, the detectives did not threaten Bolden with the death penalty unless he told them what happened.  Carreon brought up the death penalty only on one occasion and in so doing, he merely mentioned the death penalty in the context of pointing out to Bolden the severity of the potential punishment flowing from a conviction for multiple murders.  Such advisement was truthful and permissible.  (See, e.g., *Holloway, supra*, 33 Cal.4th at p. 115.)  The "save you" reference was sufficiently attenuated from the factual death penalty comment so it is clear Bolden did not understand it as a quid pro quo.  This is not the constitutionally proscribed situation "'where officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises.' [Citations.]" (*Williams, supra*, 49 Cal.4th at p. 443.)  Further, later in the interview, after having incriminated himself, Bolden told the detectives:  "You talking about that death penalty.  Just give me that.  I'll take that.  I ain't getting out."

Additionally, contrary to Bolden's claim, the detectives' exaggeration about the extent of the evidence and their questioning regarding the perpetrators' intent to kill did not render his statements involuntary.  Generally speaking, unless likely to produce a false confession, deception on the part of police is allowed.  (*People v. Smith* (2007) 40 Cal.4th 483, 505-506 (*Smith*).)  Often the detective's exaggerations are in response to

Bolden's questions, "What do you guys know," "What have you got," "Show me what you got." The police are not barred from confronting a suspect with evidence that is nonexistent or which they do not in fact have. (*Id.* at p. 506 [suspect falsely told gun residue test positive]; *People v. Farnam* (2002) 28 Cal.4th 107, 182 [misrepresentation as to defendant's fingerprints]; *People v. Jones* (1998) 17 Cal.4th 279, 299 [implication permitted that detective "knew more than he did or could prove more than he could"]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124-125 [suspect falsely told his fingerprints on getaway car].) Further, the police are not prohibited from falsely representing the suspect's accomplice gave him up. (See, e.g., *Frazier v. Cupp* (1969) 394 U.S. 731, 739; *People v. Felix* (1977) 72 Cal.App.3d 879, 885.)

Bolden faults the detectives for failing to explain first degree felony murder does not require an intent to kill before they asked him who had come up with the robbery plan, whether he and his accomplices intended to shoot the victims, and whether they intended to kill them. He contends the sole import of this line of questioning was to imply, wrongly, that Bolden would be guilty of a lesser homicide if the robbery had not been his idea and he had not intended to kill anyone and thereby lead him to admit to being involved in the killings but with a less culpable role. His position is without merit. Although Bolden was arrested for the murders of Qu and Wu during a robbery, he had not been charged with any particular crime at the time of his interview. The interview was part of the ongoing police investigation into the circumstances leading up to and resulting in the shooting deaths of Qu and Wu. The challenged line of questioning was within the permissible scope of such investigation. It is not the function of the police to determine what charges are to be brought against a suspect. Rather, the prosecuting authority makes that determination based in part on the matters elicited in the police interview. The detectives did not cross the line by promising Bolden he would be

17

charged with a lesser offense or obtain a lighter punishment if he admitted his involvement but denied any intent to rob and shoot the victims, much less kill them.[6]

### *Bolden's Jail Cell Statements to Confidential Informant Were Voluntary*

Bolden contends the trial court committed reversible error in denying his motion to suppress his jail cell statements to the confidential informant, because these statements were the "tainted product of his prior involuntary statements to police." Initially, we point out his underlying premise is fatally flawed. As discussed above, his incriminating statements during the police interview were voluntary. Further, any connection or "taint" between that confession and his confession to the confidential informant was attenuated to such an extent that Bolden's subsequent confession was not the exploited product of his first. Even if we assumed for argument sake the first confession was involuntary, we would still hold on this record that any connection or "taint" between this confession and this first confession is sufficiently attenuated so that this confession is voluntary and admissible.

"'[W]here—as a result of improper police conduct—an accused confesses, and subsequently makes another confession, it may be presumed the subsequent confession is the product of the first because of the psychological or practical disadvantages of having "'let the cat out of the bag by confessing.'" [Citations.]'" (*McWhorter, supra*, 47 Cal.4th at pp. 318, 359.) This "presumption is rebuttable, with the prosecution bearing the burden of establishing a break in the causative chain between the first confession and the subsequent confession." (*Ibid.*) "'The degree of attenuation that suffices to dissipate the

---

[6] In any event, admission of this confession was harmless beyond a reasonable doubt in view of Bolden's more detailed incriminating jail cell confession to the confidential informant, which, as we shall discuss, clearly was not tainted in any way by Bolden's police interview confession. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); cf. *Arizona v. Fulminante* (1991) 499 U.S. 279, 297-300; see also, *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884 ["improper admission of a confession can be harmless if, for example, the defendant confessed multiple times"].)

18

taint "requires at least an intervening independent act by the defendant or a third party" to break the causal chain in such a way that the second confession is not in fact obtained by exploitation of the illegality. [Citations.]' [Citation.]" (*Id.* at p. 360.)

We have listened to and watched defendant's videotaped jail cell confession to the informant. The totality of the circumstances surrounding Bolden's jail cell statements reveal they were not obtained by exploitation of what transpired during the earlier police interview, and that no coercive tactics were employed. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1041.) The jail cell conversation took place more than an hour after the police interview, in a different setting, and before a third party. The exchange between Bolden and the confidential informant was not conducted in an adversarial or hostile atmosphere. Following the police interview that ended at 11:03 p.m., Bolden was alone for 27 minutes. At 12:30 a.m., he was placed in the jail cell with the confidential informant. The detectives were not present. Bolden was alone with the informant, who represented himself to be a fellow Blood gang member. Moreover, the nature of the exchange reflected their encounter was friendly and intimate. Bolden freely and without hesitation bragged to the informant about what had occurred in both shooting incidents and details about his own participation. It is noteworthy in the police interview Bolden denied involvement in the February 2012 shooting with its gang overtones but readily bragged about it to the informant, who he thought to be a fellow older Blood gang member. [7]

---

[7] Our decision is limited to the facts, and we do not decide as a general matter that a recorded jail informant confession following a confession to police is always sufficiently attenuated to be admissible (cf. *Missouri v. Seibert* (2004) 542 U.S. 600 [improper two step interrogation technique to avoid *Miranda*].)

19

### *Is The Miranda Booking Exception Applicable to Bolden's Phone Number Statement?*

Following the close of evidence, defense counsel moved to suppress Bolden's telephone number statement to police prior to his *Miranda* advisements. He argued the police already had this information and the question was "investigative in nature" and designed to "elicit incriminating evidence." The trial court acknowledged Bolden's cell phone number had "more significant relevance in this case than it would in an ordinary case." The court, however, denied the suppression motion, concluding the phone number "falls into the category of prebooking-type questions, prebooking information that does not require *Miranda*" admonishments. The court found the detectives were not asking for the number to obtain incriminating evidence and the police eventually would have obtained his number through other investigatory means. Defendant's cell phone number and subscriber information were in the hands of the police well before he was booked.

At trial, a Tracfone subpoena compliance analyst testified Bolden's cell phone number was (323) 599-3681. Detective Lait testified (323) 599-3681 was one of the target numbers in his wiretap application and during his investigation, he learned this number was a cell phone primarily used by Bolden. Two incriminating recorded calls from this phone number involving Bolden were played for the jury.

Bolden contends the trial court erred in refusing to suppress his statement regarding his phone number, because it was elicited in violation of *Miranda*.

Without deciding whether the telephone number question is exempt from Miranda under the booking exception, any error introducing this admission is harmless, in that there was ample, independent, uncontradicted evidence that it was Bolden's telephone number.

An error in admitting a statement obtained in violation of *Miranda* is reviewed under the "harmless beyond a reasonable doubt" standard of *Chapman*. (*People of Johnson* (1993) 6 Cal.4th 1, 32-33.) Such an error is generally deemed harmless if there was other, properly admitted evidence establishing the fact sought to be proven by means

of the statement. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 60.) Here, other overwhelming independent evidence established it was Bolden's phone number.

As Bolden concedes, the police had already obtained admissible phone records showing he was the cell phone subscriber for (323) 599-3681. The jury heard evidence that the police had obtained Bolden's cell phone records through a court order, and that those records established that "Javier Bolden" was the subscriber for number "(323) 599-3681." Detective Lait testified he learned through his investigation, which preceded Bolden's interview, that (323) 599-3681 was the number for a cell phone being used primarily by him. And the jury heard Bolden's voice on two incriminating cell phone calls for number (323) 599-3681 that had been recorded before his arrest and police interview. There is nothing to support Bolden's speculation that without his statement, the jury might have concluded that the cell phone was not actually his. Thus, any error in failing to suppress the phone number portion of the statement was harmless beyond a reasonable doubt.

### *Omission of Lesser Offense Instruction Harmless*

Bolden contends the trial court committed reversible error by failing to instruct sua sponte on second degree murder and involuntary manslaughter as lesser included offenses of the premeditated murder charged in counts 1 (Wu) and 2 (Qu). Omission of such instruction was harmless, because there is no reasonable probability of a better result if the instructions had been given.

Counts 1 and 2 each charged Bolden with first degree murder on the theory of premeditated murder, i.e., he "did unlawfully, and with malice aforethought" kill the victim. In his opening statement, however, the prosecutor proceeded on a felony murder theory instead. During the case in chief, the trial court confirmed the People were "only proceeding on the theory of felony murder" and were "not proceeding on malice murder." When the court asked if the prosecutor wanted the words "malice aforethought" removed from these counts, he asked for time to consider such removal. The court indicated

21

removal was not critical, "[be]cause I don't think there's any issue derived from it." During a discussion on jury instructions, the court reaffirmed the prosecutor's earlier indication of proceeding under a felony murder theory only. Defense counsel did not request instruction on any other theory and declined to request instructions on lesser offenses. During argument, the prosecutor relied only on the felony murder theory.

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.]" (*People v. Shockley* (2013) 58 Cal.4th 400, 403 (*Shockley*).) In other words, the state of the evidence must be such that a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. (Id. at p. 404.) This duty exists even where the lesser included offense is inconsistent with the defendant's own theory of the case and the defendant objects to the instruction. (*People v. Banks* (2014) 59 Cal.4th 1113, 1160 (*Banks*).)

"To determine if an offense is lesser and necessarily included in another offense . . . , we apply either the elements test or the accusatory pleading test. 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' [Citation.]" (*Shockley, supra,* 58 Cal.4th at p. 404.) "When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.' [Citation.] '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and *so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense*.' [Citation.]" (*Banks, supra,* 59 Cal.4th at p. 1160, italics added.)

The evidence is substantial if a reasonable jury could find such evidence persuasive. (*People v. Benavides* (2005) 35 Cal.4th 69, 102.) Any doubts regarding the

22

sufficiency of the evidence to support the lesser offense are resolved in favor of the defendant. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.) Whether the trial court improperly failed to instruct on a lesser included offense is reviewed de novo. (*Banks, supra*, 59 Cal.4th at pp. 1113, 1160.)

"Even if second degree murder and manslaughter are not lesser included offenses of first degree felony murder, they are lesser included offenses of a premeditated and deliberate murder with malice. [Citations.]"[8] (*People v. Campbell* (2015) 233 Cal.App.4th 148, 161-162) "Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. [Citations.]" (*People v. Hansen* (1994) 9 Cal.4th 300, 307; overruled on other grounds in *People v. Chun*, *supra*, 45 Cal.4th at p. 1119.) "Involuntary manslaughter" involves an unintended killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)

The issue presented by Bolden can be phrased: Does substantial evidence exist from which a reasonable jury could find Bolden committed second degree murder or involuntary manslaughter but not premeditated murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) We need not, and therefore do not, reach this issue. The absence of instruction on second degree murder and involuntary manslaughter was harmless beyond a reasonable doubt. (*Banks, supra*, 59 Cal.4th at pp. 1113, 1116 [harmless error test under *People v. Watson* (1956) 46 Cal.2d 818, 837].) Under this test, "evidence sufficient to warrant an instruction on a lesser included offense does not necessarily

---

[8]     "First degree felony murder is a killing during the course of a felony specified in section 189, such as rape, burglary, or robbery. Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 . . . .' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1182.)

23

amount to evidence sufficient to create a reasonable probability of a different outcome had the instruction been given. [Citations.]" (*Banks, supra,* 59 Cal.4th at p. 1161.)

In this matter, overwhelming evidence supports the jury's guilty first degree murder verdicts on counts 1 and 2 based on a felony murder theory, and the evidence in support of a lesser offense is minimal and not reasonably persuasive to the jury. (*Banks, supra*, 59 Cal.4th at p. 1161; *People v. Lipscomb* (1993) 17 Cal.App.4th 564, 570 ["'no evidence that the offense is less than or other than that charged.'"])

In returning a verdict of guilty on counts 1 and 2, the jury found true the felony special circumstance allegation as to each count, namely, the murders of Wu and Qu were committed while Bolden "was engaged in the commission of the crime of robbery . . . within the meaning of . . . Section 190.2(a)(17)." The jury thus found Bolden participated in the robbery of Wu and Qu. Bolden was convicted as an accomplice to the actual murderer. As an aider and abettor, the jury necessarily found Bolden acted with the intent to kill in finding true the felony murder special circumstance allegation.[9] These findings are supported by overwhelming evidence, mainly from Bolden's own statements. When asked what the plan was, Bolden told police to "get some cash" from USC "kids," because "it's easy to take their stuff" and he joined in the plan because Barnes did; and he told Barnes he was with him. After Barnes shot Qu and Wu, Bolden directed him to "get what you can get" to complete the robbery. Barnes responded by

---

[9]      "[I]ntent to kill" must be established where, as here, the defendant is an aider and abettor rather than "the actual killer." (§ 190.2, subd. (c); *People v. Anderson* (1987) 43 Cal.3d 1104, 1147 ["intent to kill is not an element of the felony-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved"]; see also, *People v. Jones* (2003) 30 Cal.4th 1084, 1117.) The trial court did not instruct the jury on intent to kill as to this special circumstance. At best this omission is harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. 18.) Bolden does not challenge the sufficiency of the evidence on intent to kill. Importantly, the court did instruct on the necessity of intent to kill as to the multiple murder special circumstance allegation, i.e., "[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree" (§190.2, subd.(a)(3)), which the jury also found true. The jury therefore also found intent to kill in finding true the felony murder special circumstance.

taking the victim's phones. Additionally, Bolden told the confidential informant the shooting resulted from an unsuccessful carjacking while "[w]e was out robbin' people." He explained, "We was about to take the car but then we heard people come out the house, and [Barnes] just snatched the phones. We got caught because of the fucking phones." As for the shootings, he told the informant that he also shot, but the bullet he fired did not break the passenger's window. Measured against such damning evidence, Bolden's statements to police that "I just – I didn't want to," shoot anyone and "as along [as Bolden] ain't got to shoot nobody," Barnes should take "whatever [he] can get" are simply self-serving and inconsequential

### *Denial of Mistrial Not Abuse of Discretion*

Bolden contends the trial court abused its discretion in denying his mistrial motion. We disagree. The court's initial erroneous ruling that intent to kill was not an element of the multiple-murder special circumstance was nonprejudicial, because the jury was instructed correctly on the law and defense counsel was afforded the opportunity to re-open his argument to address the issue of intent to kill before the jury, which opportunity the defense declined.

During a discussion about jury instructions, the trial court indicated CALJIC Nos. 8.80.1 and 8.81.3 regarding the multiple murder special circumstance would be given. No objection was made. Pursuant to CALJIC No. 8.80.1, the jury would be instructed that a defendant who was an aider and abetter must have acted with the intent to kill.[10]

---

**10**     The applicable CALJIC No. 8.80.1 reads: " [If you find that a defendant was not the actual killer of a human being, [or if you are unable to decide whether the defendant was the actual killer or [an aider and abettor] [or] [co-conspirator],] you cannot find the special circumstance to be true [as to that defendant] unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] any actor in the commission of the murder in the first degree] [.] [, or with reckless indifference to human life and as a major participant, [aided,] [abetted,] [counseled,] [commanded,]

25

Following the prosecution's closing argument, defense counsel raised the issue of intent to kill. After reviewing the use note for this instruction, the court initially ruled "[t]here is no requirement to show an intent to kill for multiple murder." In his closing argument, defense counsel argued the prosecution failed to prove Bolden was involved at all in the shootings. He did not address Bolden's mental state. The prosecutor then made his rebuttal argument.

On the next day, the court reconsidered its prior ruling on the intent to kill issue. After indicating the court had reviewed section 190.2, subdivision (c)[11] and *People v. Nunez and Satele* (2013) 57 Cal.4th 1 (*Nunez*),[12] the trial court stated a trial court "must instruct the jury that to find true a multiple murder special circumstance allegation as to the defendant, [the jury] must find that the defendant intended to kill the murder victims." Defense counsel responded, "I should have been able to argue the intent to kill and I was precluded by the court from doing so. It's not a big part of my argument, but obviously because - -." In interrupting counsel, the court stated, "Well, I got an easy answer. I'm going to allow you to reopen and argue." Counsel declined the court's invitation, explaining: "I don't want to re-open and argue because I feel that… I'm prejudiced in the

---

[induced,] [solicited,] [requested,] [or] [assisted] in the commission of the crime . . . which resulted in the death of a human being, namely .]"

**11** Section 190.2, subdivision (c) provides: "Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4."

**12** In *Nunez*, the Court held: "When there is evidence from which a jury could base its convictions for multiple counts of murder on the theory that the defendant was guilty as an aider and abettor, and not as the actual perpetrator, the trial court must instruct the jury that to find true [this] allegation as to that defendant, it must find that the defendant intended to kill the murder victims. [Citations.]" (*Nunez, supra*, 57 Cal.4th at p. 45.)

26

sense that… the whole basis of my closing argument . . . was that Mr. Bolden was not involved."

Defense counsel moved for dismissal of the multiple-murder special circumstance allegation for lack of intent to kill evidence. The court denied the motion, finding "the intent to kill can be shown by going up to a car to rob it and being armed with a gun" and Bolden asserted he himself shot at the car with a "deuce 5." Bolden does not contend on appeal that the finding of intent to kill is not supported by substantial evidence.

After stating he did not want to present additional argument because in so doing, such argument would "draw[] attention to that and it takes away from . . . the crux of my argument," counsel moved for a mistrial. The trial court denied the motion. The court pointed out his objection was he did not "get a chance to argue" and "I'm offering you a complete and total opportunity to re-argue. I will give you whatever time you need to argue regarding the issue of whether there needs to be an intent to kill on the multiple murder, which I believe that there does." Later, the court noted this was a situation of "clearly invited error because I'm giving [the defense] a chance to re-open"; the problem is "easily curative"; and it "only relates to one of the special circumstances."

The jury was expressly instructed that the multiple murder special circumstance allegation "requires the specific intent to kill." Mindful of this instruction, the jury found the multiple murder special circumstance to be true.

"'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial.' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 990 (*Clark*).)

The trial court did not abuse its discretion in denying Bolden's mistrial motion. Contrary to his claim, the trial court's initial mistaken ruling that the multiple murder special circumstance does not require intent to kill where the defendant is an aider and abettor, rather than actual killer, was inconsequential. The court had not instructed the jury, and when the court did instruct the jury on the multiple murder special

27

circumstance, the court specifically directed the jury that it had to find Bolden acted with the intent to kill.

Further, no prejudice flowed from the court's misapprehension of the law with respect to Bolden's ability to present a defense. The trial court did not foreclose or preclude defense counsel from reopening to argue lack of intent to kill. Rather, the decision not to argue against intent to kill was that of defense counsel alone. As a general matter, trial tactics are a matter within the sole province of defense counsel. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 219 ["Counsel's decision to so argue 'is a matter of trial tactics and strategy that a reviewing court generally may not second-guess.'"]; cf. *People v. Najera* (1972) 8 Cal.3d 504, 516 ["withdrawing a crucial defense from the case, reducing the trial to a farce or sham" amounts to ineffective assistance of counsel under the Sixth Amendment of the United States Constitution].)

Defense counsel here acknowledged that the issue of intent to kill was "not a big part of [his] argument" and that "the whole basis of [his] closing argument . . . was that Mr. Bolden was not involved." Counsel decided, and later reaffirmed his decision, not to reopen and argue lack of intent to kill because, in so doing, he would emphasize the issue of intent to kill while distracting the jury from "the crux of [his] argument," which was Bolden was not involved. This was a tactical choice on counsel's part, and reasonable. Intent to kill on the part of Bolden was not an equivocal issue. As the trial court pointed out, not only did he entertain the intent to rob when he positioned himself on the passenger side of the car, he necessarily shared the actual shooter's intent to kill when he stood there armed with his own gun and by firing his gun *after* the shooter had fatally shot the victims seated in their car. Additionally, not only would argument about the lack of intent to kill focus the jury's attention on the issue of intent to kill, such argument would no doubt allow the prosecutor during rebuttal to draw the jury's attention to the overwhelming evidence of Bolden's intent to kill .

Accordingly, the withdrawal of a crucial defense did not result from the absence of defense argument on Bolden's lack of intent to kill in the context of the multiple murder

28

special circumstances allegation. The trial court's initial misapprehension of the law that the multiple murder special circumstances does not require intent to kill did not lead to Bolden's opportunity "of receiving a fair trial" being "irreparably damaged" and thereby necessitating the grant of the mistrial motion. (*Clark, supra*, 52 Cal.4th at p. 990). The denial of the mistrial motion was not an abuse of discretion.

### *Cumulative Effect of Claimed Errors Harmless*

Bolden contends the cumulative effect of the errors committed is prejudicial and necessitates reversal of the judgment. We disagree. The cumulative effect of the claimed errors is harmless. (*People v. Homick* (2012) 55 Cal.4th 816, 884. )

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

DISPOSITION

The judgment is affirmed.


KIRSCHNER, J.[*]



I concur:



TURNER, P.J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30

The People v. Javier Bolden
B260188

BAKER, J., Concurring

I concur in the judgment. I write separately to explain the reasons why I conclude the trial court's decision not to give lesser included offense instructions on second degree murder and involuntary manslaughter was harmless.

A reviewing court assesses a claim that a trial court erred in declining to give a lesser included offense instruction under the *People v. Watson* (1956) 46 Cal.2d 818 test for prejudice, namely, whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836; *People v. Banks* (2014) 59 Cal.4th 1113, 1161 (*Banks*), overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3; *People v. Breverman* (1998) 19 Cal.4th 142, 176-177 [appellate review focuses on what "a jury is likely to have done in the absence of the error under consideration" and may consider whether the evidence supporting the verdict "is so relatively strong, and the evidence supporting a different outcome is so comparatively weak," that there is no reasonable probability the claimed error affected the result] (*Breverman*).)[1] As I read the majority opinion, it concludes the absence of instructions on second degree murder and involuntary manslaughter was not prejudicial error because (1) overwhelming evidence proved defendant guilty of felony murder *and* because (2) overwhelming evidence proved defendant had the intent to kill victims Wu and Qu. (*Ante*, at p. 24.) The first conclusion is sound and it is dispositive; the second conclusion—that there is *overwhelming* evidence of defendant's intent to kill—is both unnecessary and questionable on this record.

_____

[1]      Although the majority cites *Banks* for the proposition that the *People v. Watson* standard applies, the majority appears to go further and hold the "absence of an instruction on second degree murder and involuntary manslaughter was harmless beyond a reasonable doubt." (*Ante*, at p. 23.) My analysis and conclusion rest solely on the *People v. Watson* standard.

Supreme Court cases establish the failure to give instructions on second degree murder and involuntary manslaughter in this case was not prejudicial error.  The jury in *Banks* convicted the defendant of first degree felony murder for shooting a victim who was using an ATM.  (*Banks, supra*, 59 Cal.4th at p. 1155.)  Our Supreme Court held the omission of a second degree murder instruction was harmless because the "far more plausible inference" was that the defendant killed the victim to obtain money, rather than "out of malice unrelated to any robbery." (*Id.* at p. 1161.)  Here, there is overwhelming evidence—including defendant's own admissions—that he and Bryan Barnes (Barnes) were jointly engaged in robbing Wu and Qu when Barnes shot and killed them.  (See generally *People v. Cavitt* (2004) 33 Cal.4th 187 [discussing the elements of felony murder].)  Because the evidence overwhelmingly supports the jury's verdict that Wu and Qu were killed during the commission of a robbery, it is not reasonably probable the jury would have convicted defendant of second degree murder or involuntary manslaughter rather than first degree felony murder.  The absence of lesser included offense instructions was harmless for precisely that reason.  (*Banks, supra*, at p. 1161; *People v. Castaneda* (2011) 51 Cal.4th 1292, 1328.)

The majority goes further and relies on the jury's two special circumstance murder findings to hold any error in failing to give lesser included offense instructions was not prejudicial.  This, however, complicates an otherwise straightforward resolution of the issue.

As the majority recognizes, the trial court's instruction on the robbery-murder special circumstance omitted an essential element: it did not require the jury to find that defendant, who was an aider and abettor, had the intent to kill.  The jury *was* instructed, however, that it must find defendant intended to kill in order to conclude the prosecution had proven the multiple murder special circumstance.  The majority relies on the multiple murder finding of an intent to kill to conclude the omission of the intent element from the trial court's robbery-murder special circumstance instruction was harmless.  (See *ante*, at p. 24, fn. 9.)  I believe sufficient evidence supports the jury's finding, implicit in its

2

determination the multiple murder special circumstance had been proven, that defendant had the intent to kill. I therefore agree that the omission of the intent to kill element from the robbery-murder special circumstance was harmless beyond a reasonable doubt.

Where the majority and I part company, however, is on the question of the strength of the evidence that defendant intended to kill Wu and Qu. I believe the evidence of such an intent, while sufficient, was not overwhelming. I therefore do not rely, as the majority does, on the jury's resolution of the robbery-murder special circumstance finding to conclude the absence of lesser included offense instructions was harmless. The rationale on which I rely also avoids placing heavy emphasis on an intent finding made by the jury in the absence of any argument to the contrary by defense counsel.

There was overwhelming evidence that defendant was guilty of first degree felony murder. In light of that evidence, there is a de minimis chance, if any, that the jury would have returned not guilty verdicts on first degree murder and convicted defendant only of second degree murder or involuntary manslaughter. When addressing defendant's argument in favor of lesser included offense instructions, I would leave it at that.

BAKER, J.

3